

**SO ORDERED.**

**SIGNED this 28 day of February, 2018.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                           CASE NO. 17-00615-5-DMW

RANDI SULLIVAN WOLK
                                                 CHAPTER 13
            DEBTOR

### ORDER DENYING CONFIRMATION OF PLAN

This matter comes on to be heard upon the Minutes of 341 Meeting and Motion for Confirmation of Plan ("Motion for Confirmation") filed by John F. Logan, Esq. ("Trustee"), Chapter 13 trustee, on November 28, 2017, the Response to Chapter 13 Trustee's Motion for Confirmation filed by Jonathan Gardner Wolk ("Mr. Wolk") on December 23, 2017 and the Response to Objection to Confirmation Filed by Jonathan G. Wolk filed by Randi Sullivan Wolk ("Debtor") on January 9, 2018. The court conducted a hearing in Raleigh, North Carolina on February 7, 2018. Michael B. Burnett, Esq. appeared for the Trustee, Travis Sasser, Esq. appeared for Mr. Wolk, and William F. Braziel III, Esq. appeared for the Debtor. Based upon the pleadings, the testimony and other evidence presented, the arguments of counsel and the case record, the court makes the following findings of fact and conclusions of law:

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtor filed a voluntary petition ("Petition") for relief under Chapter 13 of the United States Bankruptcy Code ("Code") on February 7, 2017 ("Petition Date"). The court appointed the Trustee to fulfill the duties as provided in 11 U.S.C. § 1302.

3. The Debtor and Mr. Wolk were married on August 1, 1993 and separated in December, 2012. The parties executed a Separation Agreement and Property Settlement ("Agreement") dated June 24, 2013, obligating Mr. Wolk to pay alimony and child support to the Debtor. Pursuant to the Agreement, the Debtor took possession of the parties' former marital residence ("Property"). At the time of the Agreement, the Property served as collateral for loans from North Carolina State Employees' Credit Union ("SECU") and Capital Bank. SECU held a first priority deed of trust, and Capital Bank held a second priority deed of trust upon the Property. The Debtor and Mr. Wolk were makers of the loans with SECU and Capital Bank, having joint and several liability for those loans.

4. The Agreement required the Debtor to continue servicing the debts in favor of SECU and Capital Bank until the Debtor was able to refinance those loans. Pursuant to Section H of the Agreement, the parties agreed

> to save and hold harmless the other party . . . from and against any and all liability in connection with any indebtedness assumed under the terms of this Agreement and [to] hereby indemnify and hold the other party harmless against any and all harm, expense, loss or other damage, including attorney's fees, in connection therewith.

5.     The Debtor did not refinance the loans and ultimately defaulted on the obligations to SECU and Capital Bank.  Prior to the Petition Date, SECU foreclosed under its deed of trust. Capital Bank, realizing nothing from the foreclosure sale, subsequently filed a collection action against the Debtor and Mr. Wolk in Wake County, North Carolina ("Capital Bank Action") seeking payment of the balance due from the Debtor and Mr. Wolk under the Capital Bank loan.

6.     The filing of the Petition stayed the Capital Bank Action as to the Debtor and Mr. Wolk pursuant to 11 U.S.C. §§ 362 and 1301, respectively.  The court entered an Order on August 14, 2017 granting Capital Bank relief from the 11 U.S.C. § 1301 "codebtor" stay to proceed with the Capital Bank Action against Mr. Wolk.  Capital Bank has filed a proof of claim in this case asserting an unpaid balance of $105,221.23 as of the Petition Date, and that claim will be paid as an unsecured claim through any Chapter 13 plan the court confirms.  If the Debtor successfully completes a Chapter 13 plan in this case, any amount of the obligation to Capital Bank that is not paid through the plan will be discharged pursuant to 11 U.S.C. § 1328, leaving Mr. Wolk solely liable for the unpaid portion of the debt.

7.     Mr. Wolk has an allowed unsecured claim against the Debtor in the amount of $1.00.  Mr. Wolk's proof of claim included the full amount due to Capital Bank, but the court disallowed that portion of the claim pursuant to 11 U.S.C. § 502(e) because the claim was "for reimbursement or contribution [and was] contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." 11 U.S.C. § 502(e).  The court allowed a claim in the amount of $1.00 to account for the possibility that Mr. Wolk may ultimately become the holder in due course of the loan through a purchase of the promissory note or a co-maker with full rights of contribution in the event Mr. Wolk satisfies the debt.  In either of those events, the claim amount held by Capital Bank will then be held by Mr. Wolk.

8.     The Debtor has not received any alimony payment since January, 2017, the month before the Petition Date.  The Debtor has instituted a state court action against Mr. Wolk for the payment of alimony, and a hearing on that issue is scheduled to be held in May, 2018 in the Wake County District Court.  Mr. Wolk asserts the alimony required under the Agreement is intrinsically tied to the assumption that the Debtor would maintain payments to SECU and Capital Bank, and the Debtor's failure to comply with the terms of the Agreement warrants termination of the alimony payments.

9.     Concurrently with the Petition, the Debtor filed schedules showing her assets, liabilities, income and expenses, as well as Forms 122C-1 and 122C-2 (collectively, "Means Test") calculating her disposable income and the amount she must pay into a Chapter 13 plan.[1]  The Means Test stated that the Debtor's "monthly disposable income under § 1325(b)(2)" was $9.28.  The Debtor's Schedule J filed with the Petition showed monthly net income of $603.66.  That amount was higher than the disposable income reflected on the Means Test because the Debtor receives $1,700.00 each month in child support, and child support is excluded[2] from a debtor's income for purposes of the Means Test.

10.    Schedule I filed with the Petition disclosed the Debtor was making monthly retirement contributions in the amount of $1,287.00 and was receiving alimony in the monthly

---

[1] Section 1325 of the Code requires that "[i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan . . . the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B).  The Debtor is an above-median income debtor, and together, §§ 1325(b)(2) and (3) dictate that the Debtor's expenses should be calculated pursuant to 11 U.S.C. §§ 707(b)(2)(A) and (B) to determine the Debtor's disposable income.  The Means Test implements the calculations required by § 1325.

[2] Child support payments that a debtor receives are included in a debtor's income on Form 122C-1 but subsequently are deducted from income on Line 40 of Form 122C-2.

4

amount of $1,500.00. Schedule J stated the Debtor's monthly expenses included payments in the amount of $355.00 for student loan debt.

11. The Debtor filed a Chapter 13 plan on March 21, 2017. That plan proposed to pay "$25 for 1 months, followed by $57.00 for 58 months" and estimated a total distribution of $600.00 to the Debtor's unsecured creditors. The Trustee sought confirmation of those plan terms, except the Debtor would make payments of $57.00 for 59, rather than 58, months. The Trustee's amendment was consistent with the Debtor's applicable commitment period of 60 months as an above-median income debtor.

12. Mr. Wolk objected to confirmation of a plan under the terms proposed by the Trustee on a number of grounds. In his objection, Mr. Wolk asserted the Debtor's monthly retirement contributions of $1,287.00 were excessive, and the Debtor should not be permitted to continue contractual payments on her nondischargeable student loan debt at the expense of other unsecured creditors. Mr. Wolk challenged the Debtor's monthly income tax expense listed on the Means Test as inaccurate, because the Debtor received a significant tax refund for the 2016 tax year. The Debtor received the tax refund after the Petition Date, and although the Debtor stated at her meeting of creditors that she expected the refund, she failed to update her schedules or file an updated Means Test upon receipt of the refund in May, 2017.

13. The court conducted a hearing on June 28, 2017, at which the Debtor stated she filed amended schedules ("Amended Schedules") the morning of the hearing, at least in part to address the issues raised by Mr. Wolk. The court denied confirmation at the conclusion of the hearing, and in its Order denying confirmation of the plan, the court noted that many aspects of the Debtor's monthly finances had changed since the Petition Date, yet "the Debtor neglected to file . . . amendments [to her schedules] until just prior to the hearing."

5

14. The Debtor filed an Amended Chapter 13 Plan ("Amended Plan") nearly two months after the hearing, on August 22, 2017. The Amended Plan proposes to pay $57.00 per month for six months, followed by $80.00 per month for fifty-four months, with a disclaimer stating "*This amount is an estimate. The Debtor proposes in good faith a $1,000.00 dividend to general unsecured creditors. The base amount shall be the amount necessary to pay all priority claims in full and the secured claims as set out [in the plan]." The Amended Plan proposes to pay the Debtor's only secured creditor directly, rather than through payments remitted by the Trustee. The Motion for Confirmation mirrors the monthly payment terms proposed by the Debtor and uses the monthly disposable income listed on the Means Test filed with the Petition as the basis for a $556.80 minimum amount that would be paid to unsecured creditors through the Amended Plan.

15. The Amended Schedules disclose a 2016 federal tax refund received by the Debtor in the amount of $4,456.00 which the Debtor exempted to the extent of $3,335.00 pursuant to N.C. Gen. Stat. 1C-1601(a)(2). The refund indicates the Debtor was withholding from her income approximately $371.00 more than she needed to each month in 2016. The Means Test states that "if you expect to receive a tax refund, you must divide the expected refund by 12 and subtract that number from the total monthly amount that is withheld to pay for taxes." The Debtor may not have been aware of the expected refund when she filed the Means Test, but the Debtor did not file an amended Means Test upon learning she would receive a refund or upon actually receiving the refund. If the proper monthly tax amount were factored into the originally filed Means Test, the Means Test would indicate the Debtor had disposable income of approximately $380.00 per month that could be committed to unsecured creditors through a Chapter 13 plan.

16. The Amended Schedules disclose that the Debtor makes monthly payments to her domestic law attorney in the amount of $800.00 for services related to the state court action against

6

Mr. Wolk for alimony. The Debtor testified that she owes approximately $3,000.00 to her domestic law attorney, and that amount is expected to increase after representation at the hearing in May.

17.     The Debtor testified that she has not made any direct payments to her student loan creditor since the Petition Date, even though the originally filed Schedule J indicated she was making those payments.

18.     The Debtor previously paid $260.00 monthly for the couple's minor child's health insurance premiums, but Mr. Wolk began paying for the child's health insurance through his employer in 2018 and deducts $250.00 from the child support payment each month. This arrangement does not result in any significant net change to the Debtor's actual monthly finances; however, this change may affect the calculations on an updated Means Test, as the Debtor no longer has a direct expense relating to the child's health insurance. The Debtor testified that her health insurance premiums have increased by approximately $30.00 per month since she filed the Amended Schedules.

19.     The Debtor testified that she has reduced the monthly contributions to her retirement funds since Mr. Wolk stopped paying alimony. The Amended Schedules show the Debtor has ceased "voluntary contributions for retirement plans" in the amount of $496.17 per month and reduced contributions to her § 403(b) retirement account[3] from $790.83 per month to $106.00 per month. The Debtor testified, though, that she expects to increase her retirement contributions if Mr. Wolk resumes alimony payments.

20.     The Debtor asserts that because she is no longer receiving alimony, she now has less disposable income than she did on the Petition Date. If the Debtor is successful in her state

---

[3] The Debtor is employed by a tax-exempt, non-profit organization as classified by IRC § 501(c)(3), and the Debtor's employer apparently offers employees the option to contribute income to a § 403(b) retirement plan.

7

court action against Mr. Wolk for alimony, her monthly income will increase. The Debtor asserts the court should confirm the Amended Plan on the condition that the Debtor file an updated Means Test after the state court action has been resolved. A confirmation order is treated as a final judgment with *res judicata* effect, and there are significant hurdles to modification of a confirmed plan. *See Murphy v. O'Donnell (In re Murphy)*, 474 F.3d 143, 149 (4th Cir. 2007). Under the circumstances of this case, no plan should be confirmed until the Wake County District Court has issued a ruling determining the amount of alimony, if any, that Mr. Wolk must pay to the Debtor. No secured creditors will be prejudiced by a delayed confirmation, and the alimony component of the Debtor's income is too significant to ignore for purposes of confirmation, even with the assurance that the Debtor would provide updated information once determined. If the Debtor is awarded alimony, the inaccuracies within the Means Test will become more relevant again, and a revised Means Test may dictate a higher plan payment.

21.     Confirmation should also be denied because the court does not find the Amended Plan has been proposed in good faith to satisfy the requirement of 11 U.S.C. § 1325(a)(3). The Debtor's good faith is questioned because she failed to file an amended Means Test upon receipt of the $4,456.00 tax refund, as an amendment to her monthly taxes would directly affect the amount she is required to pay to her creditors. The Debtor now relies on her lower income in an apparent attempt to sidestep the issue that an amended Means Test was never filed.[4] According to her testimony, the Debtor is committed to increasing her retirement contributions to the original

---

[4] The Debtor presented an updated Means Test at the hearing which calculates disposable income without any alimony payment included in the Debtor's income and with a reduced amount for monthly taxes; however, a revised Means Test has never been filed with the court. The Debtor testified that she has reduced the income tax deductions from her monthly income from $1,343.33 to $1,040.00 because she no longer is receiving the alimony as taxable income; however, that testimony implies the Debtor was only deducting $1,343.33 on the Petition Date and ignores the $300.00 monthly tax expense included separately on the originally filed Schedule J and the $1,643.00 deduction taken on the Means Test. If Mr. Wolk were to resume alimony payments in full, it appears the Debtor's monthly taxes would increase to as much as $1,340.00, and the Debtor would be able to claim that deduction on the Means Test assuming it was not challenged by an interested party.

Means Test levels if alimony payments resume. The Debtor has created a presumption that her personal financial security is far more important than her obligation under Chapter 13. If the Debtor files an amended plan, the amount the Debtor chooses to contribute to her retirement at the expense of her unsecured creditors will be a factor for the court to consider in analyzing the Debtor's good faith.

22.     Lastly, the court cannot ignore the net income amount stated on the originally filed Schedule J merely because the Debtor is an above-median income debtor using the Means Test to determine disposable income. The court generally is bound by the provisions of § 1325(b) governing the calculation of a debtor's disposable income, even if a debtor's schedules show a higher disposable income. *See Pliler v. Stearns*, 747 F.3d 260, 266-67 (4th Cir. 2014). The requirements of § 1325(b), however, are separate from the requirement that a plan be proposed in good faith pursuant to § 1325(a)(3). The initial amount of the proposed plan payment also contributes to the court's skepticism of the Debtor's good faith, particularly in light of her monthly net income. The Amended Schedules, of course, reflect much lower net income due to the Debtor no longer receiving alimony and the Debtor making payments to her domestic law attorney; however, if Mr. Wolk is ordered or elects to pay alimony in the future, the Debtor once again may have a Schedule J showing the ability to pay much more each month than an updated Means Test might dictate. The Debtor will have a better idea of the amount she owes to her domestic attorney after the state court action concludes,[5] and it may become apparent that the Debtor's monthly net income will increase even more once she has paid that attorney in full. Finally, the Debtor's originally filed Schedule J revealed her intent to continue contractual payments on

---

[5] The court notes that to the extent the Debtor proposes to use any alimony she recovers through the assistance of her domestic law attorney to increase her retirement savings rather than to increase the dividend to unsecured creditors, Mr. Wolk has forecast that he would disagree with any characterization by the Debtor of the attorney fees as an administrative expense entitled to priority under 11 U.S.C. § 507.

9

nondischargeable student loans, and once the Debtor's alimony income is determined, the court will want to know the Debtor's intentions regarding the repayment of those loans.

23.  The Motion for Confirmation should be denied to allow time for the parties or the state court to determine the alimony amount, if any.  After that determination, the Debtor is expected to file an updated Means Test that reflects accurate deductions from the Debtor's income. An updated Means Test may result in a second amended plan being filed, proposing a higher dividend to the Debtor's unsecured creditors; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Motion for Confirmation be, and hereby is, denied; and

2. Upon a determination by the Wake County District Court of the amount of alimony, if any, Mr. Wolk is required to pay to the Debtor, the Debtor may file any documents she deems appropriate and necessary to seek confirmation of a Chapter 13 plan.

END OF DOCUMENT